

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>)<br>v. )<br>)<br>)<br>)<br>PAUL BURKS )<br>)<br>)<br>)<br>_____ ) | DOCKET NO. 3:14 CR 208-MOC<br><br>**BILL OF INDICTMENT**<br><br>Violations:<br><br>18 U.S.C. § 371<br>18 U.S.C. § 1341<br>18 U.S.C. § 1343<br>18 U.S.C. § 1349 |

THE GRAND JURY CHARGES:

### I. Introductory Allegations

At the specified times and at all relevant times:

1. From in or about January 2010 through in or about August 2012, the defendant PAUL BURKS and others named and unnamed in this Bill of Indictment ("the co-conspirators") engaged in an over $850 million "Ponzi" scheme by representing that victims would receive a bogus 125% return on investment based on profits from a sham internet-based penny auction company called Zeekler and its purported advertising division, ZeekRewards.

2. The co-conspirators falsely represented that Zeekler was generating massive profits from its penny auctions and that the public could share in such profits through investment in ZeekRewards. In truth and fact, Zeekler's purported profits were bogus and ZeekRewards operated as a fraudulent Ponzi scheme whereby the co-conspirators used monies from later victim-investors to pay fraudulent returns to earlier victim-investors and to personally enrich themselves.

3. As a result of the co-conspirators' scheme and artifice to defraud, victims worldwide, including over 1,500 victims in the Charlotte, North Carolina area, lost at least $750 million.

### II. Relevant Entities and Individuals

4. Defendant PAUL BURKS, a resident of North Carolina, owned Rex Venture Group, LLC ("RVG") through which he owned and operated Zeekler and ZeekRewards (collectively "Zeek"). PAUL BURKS was President of Zeekler and ZeekRewards which maintained offices in North Carolina and elsewhere.

1

5. Dawn Wright Olivares, a co-conspirator unindicted herein, was a resident of Arkansas and served as Zeek's Chief Operations Officer.

6. Daniel C. Olivares, a co-conspirator unindicted herein and the step-son of Dawn Wright Olivares, was RVG's senior technology officer and was responsible for, among other things, database design, management and operation for Zeek.

7. D.D., a co-conspirator unindicted herein, was a Sales Director of Zeek.

8. R.P., a co-conspirator unindicted herein, now deceased, was a resident of Charlotte, North Carolina and was Member Services Director of Zeek and handled affiliate relations for Zeek.

9. Zeekler.com ("Zeekler") was a penny auction website. A penny auction, also called a bidding fee auction, is a type of auction in which all participants must pay to place each incremental bid.

10. ZeekRewards.com ("ZeekRewards") was the advertising division for Zeekler.

### III. Scheme & Artifice to Defraud

11. Defendant PAUL BURKS, Dawn Wright Olivares, Daniel C. Olivares, D.D., R.P., and others represented that, through ZeekRewards, victim-investors, referred to as "Affiliates," could participate in what came to be known as the Retail Profit Pool or RPP ("Zeek's profits") which supposedly allowed victims collectively to share up to 50% of Zeek's daily net profits.

12. The co-conspirators falsely represented that Zeek was generating massive retail profits. Indeed, the co-conspirators claimed that they calculated and shared with investors the "daily net profit," which supposedly represented half of each day's net retail profit.

13. In truth and fact, the "daily net profit" was not half the net retail profit of Zeekler and had no relationship to actual penny auction revenues or profits. Moreover, the co-conspirators did not keep books and records needed to calculate such a figure.

14. Defendant PAUL BURKS simply made up the "daily net profit" without any reference at all to profits.

15. The true revenue from the scheme, approximately 98% of all incoming funds, came from victim-investors.

16. Victim-investors, including numerous victim-investors in the Western District of North Carolina, sent money to ZeekRewards via the United States Postal Service as well as other commercial interstate carriers, via interstate wire communications, and by delivering checks to Zeek's office in North Carolina.

17. Each victim-investor, including numerous victim-investors in the Western District

of North Carolina, used the internet to access his or her "Back Office" on the ZeekRewards website. The Back Office, among other things, enabled each victim-investor to track his or her bid or point balance or supposed share of Zeek's profits.

## Recruiting Bogus Investments

18. Victims invested in Zeek through the purchase of "VIP Bids" in increments of no greater than 10,000. Each VIP Bid was sold for $1. Initially, the victim-investors were promised that they would receive a return on investment of 125% on each VIP Bid purchased. Thus the VIP Bids were represented as functioning like shares of Zeekler stock. Each share entitled the victim-investor to a pro rata share of up to 50% of the supposed net profits of Zeek.

19. By rigging the "daily net profit" figure, the co-conspirators ensured that the shares returned or even exceeded the promised 125% return on investment.

20. In order to participate, victim-investors were also required to pay a monthly subscription fee and to place a daily ad to purportedly attract new participants to the penny auctions. The co-conspirators designed and implemented various automated programs so that investors could easily meet the daily ad requirement, and the co-conspirators did not track whether the ads actually increased traffic, or bidding, on Zeekler.

21. During the relevant time period, the co-conspirators fraudulently obtained over $800 million from victims for VIP Bid purchases as well as over $97 million from subscription fees. The co-conspirators used this money, in Ponzi-like fashion, to pay other victim-investors in the scheme and to personally enrich themselves.

22. In order to further the Ponzi scheme, Defendant PAUL BURKS and others took numerous steps, including encouraging victim-investors not to withdraw their purported earnings and encouraging victim-investors to recruit new participants through commissions.

## Efforts to Disguise the Fraud Scheme

23. As the Ponzi scheme grew in size and scope, the co-conspirators took several steps to conceal its true nature and to prevent scrutiny by regulators by making a series of cosmetic changes. For example:

   a. Initially, the co-conspirators called the Retail Profit Pool the "compounder" and touted it as way to obtain a 125% "rebate" or "return on investment" on the purchase of "compounding bids." Over time, the co-conspirators attempted to eliminate references to the terms "compounder," "compounding bids," and 125% "return on investment," to conceal the true nature of the Ponzi scheme and to prevent scrutiny by regulators.

   b. At some point, instead of specifically promising a 125% return of investment on each dollar invested through the purchase of a VIP Bid, the co-conspirators published bogus daily figures of Zeek's profits, averaging approximately 1.8% a day, to

3

reach the 125% goal.

    i. The supposed daily Zeek's profits figure was not based on any actual computation of daily profit. Indeed Zeek lacked the books and records that would be necessary to compute such a number. Instead the RPP was made up by Defendant PAUL BURKS to artificially reach the originally advertised 125% return of investment.

    ii. These bogus daily net profit figures were generally provided by Defendant PAUL BURKS to Daniel C. Olivares to be manually entered into the Zeek computer system and were always approximately 2% for Monday through Thursday and approximately 1% for Friday through Sunday.

    iii. For example, on July 27, 2012, Defendant PAUL BURKS asked Daniel C. Olivares, "Did you already guess an RPP percentage? If not, use .0191." Daniel C. Olivares responded to Defendant PAUL BURKS, "I did, I used…0.0191."

    iv. For example, on August 9, 2012, Defendant PAUL BURKS texted Daniel C. Olivares, "…Please use the previous week for RPP until I tell you otherwise except, of course, for reversing thur and fri last week."

    i. The purported net daily profit was designed to, among other things, continue to generate a bogus 125% return on investment for each dollar invested through the purchase of a VIP Bid.

  c. Additionally, the co-conspirators later conditioned the receipt of payments for some investors on giving away VIP Bids. However, just as with the ad requirement, the co-conspirators designed and implemented various automated programs so that investors could instantly give such bids away upon the purchase of a VIP Bid. Additionally, just as with the ads, the co-conspirators did not do any research to determine whether or not the bids supposedly given away by victim-investors provided any discernable value, such as increased traffic, or bidding, on Zeekler.

<u>Co-Conspirators used Multiple Ways to Promote Zeek to Current and Potential Victims</u>

24. Co-conspirators hosted weekly conference calls and leadership calls where participants from across the world dialed in to hear details of the scheme from Defendant PAUL BURKS and others who made false representations about the profit and income of Zeek and encouraged victim-investors to invest money and to recruit others to do so based on the easy income opportunity.

25. Defendant PAUL BURKS and others also organized and attended "Red Carpet Events" where victim-investors came to hear details of the scheme in person. During Red Carpet Events and at other times the co-conspirators falsely represented that Zeekler's penny auction site was generating massive retail profits.

26. Defendant PAUL BURKS and others also utilized electronic and print media, including websites, emails, and journals, to make false and misleading statements about the success of Zeekler to recruit victim-investors.

### Co-Conspirators Lulled Investors by Promoting Supposed Compliance with the Law

27. The co-conspirators attempted to lull victim-investors and to bolster the credibility of Zeek by hiring attorneys, and touting their advice and approval of the legality and legitimacy of Zeek to victim-investors and others, including banks, in emails, letters, and conference calls. In reality, these attorneys could not have reviewed the actual books and records of Zeek, which were non-existent, nor otherwise made any determination of whether or not the profits were legitimate, which they were not.

28. Additionally, co-conspirators hired accountants and tax attorneys and touted their advice and approval of the legality and legitimacy of Zeek to victim-investors and others in emails, letters, and conference calls, with regard to issuing Forms 1099s for all constructive income received. In reality, these accountants and attorneys could not have reviewed the actual books or records of Zeek, which were non-existent, or otherwise made any determinations of whether or not the profits were legitimate, which they were not.

### The Fraud Scheme Crumbles

29. As the Ponzi scheme grew in size and scope, banks and other financial institutions began to question the co-conspirators about the fraudulent appearance of the scheme and many shut down or refused to open Zeek bank accounts. However, Defendant PAUL BURKS and other co-conspirators falsely told victim-affiliates that Zeek had merely outgrown its banks.

30. As the scheme continued and the number of victim-investors grew, the outstanding liability to victims resulting from the bogus 125% return on investment continued to rise beyond control.

31. Indeed, by August 16, 2012, there were approximately 3 billion outstanding VIP Bid points in the RPP, which the co-conspirators fraudulently represented to victims as worth approximately $2.8 billion. Yet, the co-conspirators had no accurate books and records to even determine how much cash on hand was available to redeem the victims' VIP Bid points.

32. In truth and fact, by August 17, 2012, the co-conspirators had only $320 million, (approximately 11% of $2.8 billion) available to pay out to victim-investors.

33. During the relevant time period, the co-conspirators personally enriched themselves with victim funds by diverting the following approximate amounts:

    a.    $10.1 million to Defendant PAUL BURKS and his family members;

    b.    $7.2 million to DAWN WRIGHT OLIVARES and her companies;

5

  c.  $3.1 million to DANIEL OLIVARES;

  d.  $2.3 million to R.P.; and

  e.  $2 million to D.D.

### Tax Fraud Scheme

34. Defendant PAUL BURKS and others paid themselves large salaries and other payments from victim-investors' funds and did not keep accurate and complete records of the payments.

35. Defendant PAUL BURKS and others used multiple bank accounts and internet based electronic payment services ("e-wallets"), including e-wallets located outside of the United States, to deposit funds from victim-investors and to make Ponzi payments to victim-investors and did not keep accurate and complete records of these accounts and services.

36. Rex Venture Group, ZeekRewards, and Zeekler failed to file any corporate tax returns or to make any corporate tax payments to the IRS.

37. For tax year 2011, Defendant PAUL BURKS, and others issued many IRS Form 1099s to victim-investors that purportedly reported the "income" received by the victim-investors for their participation in the scheme. Defendant PAUL BURKS also engaged attorneys and tax professionals to legitimize the issuance of the 1099s. However, in truth and fact, the vast majority of income reported to the IRS was fictional and had neither been earned nor received by the victim-investors.

  a.  In total, Defendant PAUL BURKS, and others, reported to the IRS supposed income by the victim-investors of over $108 million for the year 2011 on the 1099s issued, while ZeekRewards actually paid out less than approximately $13 million in cash to victim-investors during that year.

  b.  As a result, individual victim-investors filed false tax returns with the IRS reporting phantom income that they never actually received, and BURKS, and others were able to use the false tax notices to perpetuate the Ponzi scheme by making it seem legitimate.

6

# COUNT ONE
## (Conspiracy to Commit Wire and Mail Fraud)

38. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

39. Beginning in or around January 2010 and continuing through in or around August 2012, in the Western District of North Carolina, and elsewhere, the defendant,

**PAUL BURKS**

did unlawfully and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, including violations of Title 18, United States Code, 1343 (wire fraud) and violations of Title 18, United States Code, 1341 (mail fraud).

### Objects of the Conspiracy

40. Mail Fraud. It was a part and an object of the conspiracy that the defendant, and others known and unknown to the Grand Jury, having devised the above-described schemes and artifices to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did deliver and cause to be delivered by mail or commercial interstate carriers according to the direction thereon matters and things, for the purposes of executing said scheme and artifice, in violation of Title 18, United States Code Section 1341; and

41. Wire Fraud. It was a part and an object of the conspiracy that the defendant, and others known and unknown to the Grand Jury, having devised the above-described schemes and artifices to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said scheme and artifice, in violation of Title 18, United States Code Section 1343.

### Manner and Means

42. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 37 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Mail Fraud)

43. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

44. From in or about January 2010 through in or about August 2012, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## PAUL BURKS

with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did cause things to be deposited with and delivered by the U.S. Postal Service and private and commercial interstate carriers for the purposes of executing said scheme and artifice.

All in violation of Title 18, United States Code, Section 1341.

## COUNT THREE
## (Wire Fraud)

45. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

46. From in or about January 2010 through in or about August 2012, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## PAUL BURKS

with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did cause the transmission in interstate commerce, by means of wire communications, certain signals, including among other things, wire transfers of money to and from the bank accounts and e-wallets used by the co-conspirators; emails; internet websites; and interstate phone calls for the purposes of executing said scheme and artifice.

All in violation of Title 18, United States Code, Section 1343.

## COUNT FOUR
## (Tax Fraud Conspiracy)

47. Paragraphs 1 through 37 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

48. From in or about January 2010 through in or about August 2012, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## PAUL BURKS

did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the Grand Jury to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes.

### Manner and Means

49. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 37 of the Bill of Indictment, among others.

### Overt Acts

50. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Western District of North Carolina, and elsewhere:

    a. During 2012, Defendant PAUL BURKS and his co-conspirators filed or caused to be filed false IRS Forms 1099 in the names of victim-investors with the IRS which reported fictional income;

    b. During 2011 and 2012, Defendant PAUL BURKS and his co-conspirators opened numerous bank accounts and used e-wallets, including e-wallets based in foreign countries, to receive and disburse the fraudulent payments in the scheme.

All in violation of Title 18, United States Code, Section 371.

10

Case 3:14-cr-00208-MOC-DSC   Document 1   Filed 10/24/14   Page 10 of 11

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

51. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of indictment; and

   b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

52. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: all currency and monetary instruments constituting or derived from proceeds traceable to the scheme alleged in this bill of indictment, including but not limited to the sum of approximately $850 million in proceeds.

A TRUE BILL

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

_____
COREY F. ELLIS
ASSISTANT UNITED STATES ATTORNEY

_____
JENNY G. SUGAR
ASSISTANT UNITED STATES ATTORNEY

11